**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Aug 18 2014, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ELIZABETH A. BELLIN**
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JUSTIN F. ROEBEL**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| EFREN MENDOZA-VARGAS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A03-1311-CR-430 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable George W. Biddlecome, Judge
Cause No. 20D03-0911-FA-00053

**August 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

After this Court reversed Efren Mendoza-Vargas's convictions, he was retried and again convicted of Class A felony dealing in methamphetamine, Class D felony maintaining a common nuisance, and Class D felony possession of marijuana. He appeals for a second time, this time arguing that the trial court abused its discretion in admitting testimony from an undercover officer and a confidential source concerning prior drug transactions involving him.

Although the State did not notify Mendoza-Vargas of the confidential source until trial, the State's 404(b) notice informed Mendoza-Vargas that the State intended to offer into evidence information concerning the prior drug transactions, and the trial court ordered a brief continuance in the trial so that Mendoza-Vargas could interview the source. Because there is nothing in the record to suggest that a longer continuance would have further aided Mendoza-Vargas, we find no error in the trial court ordering a brief continuance in the trial so that Mendoza-Vargas could interview the confidential source.

Also, because Mendoza-Vargas's roommate testified that the drugs, gun, and money found during the search of the house belonged to him and that he was the drug dealer, we find that Mendoza-Vargas left the jury with a false impression of the facts and therefore opened the door to the otherwise inadmissible evidence of the prior drug transactions involving him. Because the trial court did not abuse its discretion in admitting the evidence, we affirm.

**Facts and Procedural History**

Around 8:00 p.m. on November 5, 2009, members of the Elkhart County Interdiction and Covert Enforcement (ICE) Unit as well as officers from the Indiana State Police and the Goshen Police Department executed a search warrant at 238 Pottawattomi Drive in Elkhart, Indiana. Thirty-three-year-old Mendoza-Vargas and nineteen-year-old Baldemar Montes-Verduzco lived there at the time. Several officers approached the front door in a single-file line. The lead officer knocked on the door and announced, "Police Department, search warrant," three or four times. Tr. p. 68. The officer then looked into a window and observed a man, later identified as Mendoza-Vargas, walking toward the front door. When the officer again announced, "Police Department, search warrant," Mendoza-Vargas started walking away from the door. *Id.* at 69. Believing Mendoza-Vargas was going to flee or destroy evidence, the officers used a battering ram to open the front door. The officers then entered the house, secured Mendoza-Vargas, and began searching the house.

In a second-floor bedroom, the officers found $2000 in cash inside a boot, a black bag containing six "burner" or "throwaway[]" cell phones, and documents bearing Mendoza-Vargas's name, such as his driver's license. *Id.* at 101. On the first floor in a closet off the living room, the officers found $2900 in cash inside a boot; $5100 in cash in a pair of jeans; a .22 semi-automatic rifle; 432.05 grams of marijuana; and a necklace with an image of Jesus Malverde, who is considered "the patron saint of drug smugglers." *Id.* at 108. In addition, in the first-floor bedroom closet, the officers found a toolbox containing a digital scale and 630.54 grams of methamphetamine.

The officers observed that the house had minimal furnishings and cooking tools. *See, e.g.*, *id.* at 103, 110. In addition, no drug paraphernalia was found. A lease agreement was found in a van outside the house; it showed that Mendoza-Vargas was renting the house. *Id.* at 116; State's Ex. 7.

The State charged Mendoza-Vargas with Class A felony dealing in methamphetamine, Class D felony maintaining a common nuisance, and Class D felony possession of marijuana. In November 2011 a jury found Mendoza-Vargas guilty as charged, and the trial court sentenced him to an aggregate term of forty years. On appeal, this Court reversed Mendoza-Vargas's convictions because "the police failed to scrupulously honor [his] right to remain silent" when he was interviewed during the search of his house. *Mendoza-Vargas v. State*, 974 N.E.2d 590, 597 (Ind. Ct. App. 2012).

Before his second trial, the State filed a notice of intent to offer 404(b) evidence; specifically, the State wanted to admit evidence that Mendoza-Vargas participated in a drug transaction on October 28, 2009, and that the money found in the house included proceeds from drug transactions on October 29, November 3, and November 4, 2009. Appellant's App. p. 126-27; Tr. p. 14-15. Mendoza-Vargas filed a motion in limine prohibiting the State from mentioning that Mendoza-Vargas "may have been in receipt of money from previous drug purchase transactions or that [he] associated with or knew of those individuals who were involved in those transactions." Appellant's App. p. 97. The trial court entered an order in limine that prohibited the source of the currency from being admitted absent a contrary ruling from the court; however, the fact that cash was found in the house was admissible. Tr. p. 15-16.

4

At Mendoza-Vargas's second trial, the State presented the testimony of an experienced narcotics officer who explained to the jury how drug dealers normally operate. According to this officer, 630 grams of methamphetamine indicates drug selling, not personal use, and had a street value of $30,000 to $35,000 in 2009. *Id.* at 152-53. The officer also testified that "upper-level drug dealers" have numerous cell phones because they change their phone numbers "almost every month" in order "to stay a step [ahead] of law enforcement . . . ." *Id.* at 159-60. Dealers also often have "different phones for different reasons," such as one phone for suppliers, one phone for customers, etc. *Id.* at 160. Finally, the officer described the house on Pottawattomi Drive as a "stash house":

> We have found in larger organizations, larger drug organizations, to where the higher levels within the organization will purchase a house or normally rent a house. They will then take somebody that is low in the organization, somebody that . . . is expendable. If this person gets arrested or found, it's no big deal to the higher level. It's somebody that they're willing to lose. They will take a lower-level person, put [that person] into a stash house. That person's 100 percent job is to maintain the stash house. They normally don't work. They travel very little. They are to remain there with the drugs for the security of the drugs and their sole job is to sell the drugs. A lot of the houses that we find that way there are normally more than one person within the house. Again, the drug culture, nobody trusts anybody. So the higher-level will have somebody that's a low-level person in the house, which could be a family, a friend, somebody, to kind of watch over the person that's set up in the stash house. These people also the lower-level people commonly are the ones that will rent the house. They will maintain that location for a couple months. It's very common for them to move around in the same area. That way, again, you try to stay a step ahead of law enforcement. . . . There's not a lot of belongings in the house. You won't go in and find it well-decorated. There won't be a lot of furniture, just enough for them to get by for a couple months before they will again move the stash house to another location.

*Id.* at 166-68.

In response to the State's evidence, Mendoza-Vargas presented the testimony of his roommate Montes-Verduzco. At the time of his testimony, Montes-Verduzco was

5

incarcerated as a result of his guilty plea to dealing in methamphetamine in connection with the November 5, 2009, search of the house on Pottawattomi Drive. Montes-Verduzco testified that he provided Mendoza-Vargas with money to lease the house and that the methamphetamine, marijuana, rifle, and money found in "[d]ifferent spots" around the house belonged to him. *Id.* at 191. Montes-Verduzco claimed that he had sold an ounce of methamphetamine on four occasions to a man known as "Amish" who lived in Bristol. On cross-examination, however, Montes-Verduzco acknowledged that he had given a prior statement to the police in which he denied knowledge of the drugs and money. *Id.* at 220.

The State then argued that in light of Montes-Verduzco's testimony that the "methamphetamine, marijuana, and money were all his, that he was the drug dealer," *id.* at 236,

> [t]here [wa]s no other reason for this witness to be testifying other than the fact to show that [Mendoza-Vargas] did not have knowledge of the substance, and if he did, he did not intend to deliver it. Based upon that, the State believes the door has been opened, and the State [can] elicit questions surrounding [Mendoza-Vargas's] prior involvement and drug dealing as well as show prior involvement through other witnesses that contradict this theory.

*Id.* at 204. The State asked the trial court if it could anonymously present the testimony of the undercover officer and the confidential source since they were both still operating in those capacities. *Id.* at 238. When the State disclosed that it had Confidential Source 09-019 available to testify that he was the go-between that received the drugs from Mendoza-Vargas and then paid Mendoza-Vargas for the drugs after the transactions and kept some money for himself, Mendoza-Vargas objected because "[t]his is the first that we have heard" of this witness; Mendoza-Vargas then requested a mistrial or a continuance. *Id.* at

6

The trial court responded that Montes-Verduzco "has testified it was all him. If there is evidence to the contrary, I'm going to allow the State to present it." *Id.* at 207. Although the court did not grant a mistrial, it crafted the following remedy for Mendoza-Vargas:

> I'm going to allow you to interview this witness now. And if he won't cooperate with you, I will allow him to be deposed, and I will provide the court reporter. And if he won't cooperate in the deposition, that's the end of it.

*Id.* Defense counsel then interviewed the undercover officer and CS 09-019. *See id.* at 234 (defense counsel reporting back to trial court that witnesses were cooperative during interview). Following the interviews, the court said the State could call the witnesses as rebuttal witnesses. Mendoza-Vargas objected based on Indiana Evidence Rule 404(b) because he believed the evidence was "simply provided so that the jury can infer that the defendant has a bad character and a propensity to commit the crime as charged." *Id.* at 235. The court ruled:

> The implication certainly is that the defendant was not involved in these sales and transactions. 404(b) prohibits the admission of evidence of the character of the accused in order to prove or *to show*, I should say *action* and *conformity* with the defendant's character. It is, however, permissible to admit evidence of prior acts of the accused in order to prove intent and knowledge. The fact that the defendant participated in these drug sales, according to the witness, in close proximity in time to the execution of the search warrant . . . shows his knowledge of the fact that the drugs and the money were there and his intent to maintain possession of the drugs and money as part of his illicit scheme to sell drugs.
> I'm not saying – I'm not prejudging the effect of that evidence. I'm saying what it is admissible to show. If it shows it, it does. I[f] [i]t doesn't, it doesn't. But your objection is overruled.

*Id.* at 239.

The undercover officer then testified that he purchased approximately one ounce of methamphetamine from CS 09-019 (who at the time was not yet working as a confidential

7

source for the police) on four occasions—October 28, October 29, November 3, and November 4. 2009. On each occasion, CS 09-019 was driving a gold Chevrolet Lumina. Money from these transactions was found during the November 5, 2009, search of the house on Pottawattomi Drive.

CS 09-019 learned at some point that he was selling the methamphetamine to an undercover police officer. After Mendoza-Vargas's arrest, CS 09-019 began working for the police as a paid confidential informant. CS 09-019 testified that he got his methamphetamine from Mendoza-Vargas and then sold it. When CS 09-019 received money for the methamphetamine that he sold, he kept some of the money for himself and gave the rest to Mendoza-Vargas. CS 09-019 testified that for each of the four transactions at issue in this case, he got the methamphetamine from Mendoza-Vargas and then paid Mendoza-Vargas after the transactions were completed; he also testified that he was the driver of the gold Chevrolet Lumina.

Finally, another police officer testified on rebuttal that he observed Mendoza-Vargas meet up with CS 09-019 at a Chinese restaurant after the first transaction on October 28. *Id.* at 294-95.

The jury found Mendoza-Vargas guilty as charged, and the trial court sentenced him to an aggregate term of forty years.

Mendoza-Vargas now appeals.

**Discussion and Decision**

Mendoza-Vargas contends that the trial court erred in allowing the undercover officer and the confidential source to testify at trial. His argument is two-fold.

First, Mendoza-Vargas argues that the State did not give him "reasonable notice" of the confidential source "who would testify as to personally observing [him] receive money during the prior drug transactions and personally observing [him] being present at the prior drug transactions," as required by Indiana Evidence Rule 404(b). Appellant's Br. p. 10. Evidence Rule 404(b) provides:

> **(b) Crimes, Wrongs, or Other Acts.**
>
> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses; Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:
>
>> (A) *provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial*; and
>>
>> (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

(Emphasis added). The purpose of this notice provision is to reduce surprise and to promote the early resolution of questions of admissibility. *Abdul-Musawwir v. State*, 674 N.E.2d 972, 975 (Ind. Ct. App. 1996), *trans. denied*. The notice provision is a prerequisite to the admissibility of evidence of a crime, wrong, or other act. *Id.* Failure to comply with the requirements of the rule results in the evidence being inadmissible. *Id.*

Here, the State's 404(b) notice informed Mendoza-Vargas that it intended to offer into evidence, among other things, "information relating to prior uncharged instances of delivery of methamphetamine . . . ." Appellant's App. p. 126 (listing dates of drug transactions). In response, Mendoza-Vargas filed a motion in limine, and the admissibility

9

of this evidence was resolved before trial, with the trial court ruling that the State could not present evidence of the prior drug transactions. *See* Tr. p. 15-16. Thus, Mendoza-Vargas had reasonable notice that the State wanted to offer evidence of specific drug transactions, even though the State did not list names in the 404(b) notice.[1]

In addition, the State used the confidential source as a rebuttal witness. Nondisclosure of rebuttal witnesses is excused when the witness was unknown and unanticipated; known and anticipated witnesses, even if presented in rebuttal, must be identified pursuant to a court order, such as a pre-trial order, or to a proper discovery request. *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 179 (Ind. 1993); *Beauchamp v. State*, 788 N.E.2d 881, 892 (Ind. Ct. App. 2003). A "known" witness refers to knowledge of the existence of that witness; an "anticipated" witness is one which a party or his counsel anticipates the need for at trial. *McCullough*, 605 N.E.2d at 179.

The State argues that it was not known or anticipated that CS 09-019's testimony would be necessary until defense witness Montes-Verduzco testified. In addition, the State notes that the trial court entered an order in limine *prohibiting* it from presenting evidence of the prior drug transactions. Nevertheless, the State claims that Montes-Verduzco's testimony that the drugs and money belonged to him and that he was the drug dealer opened the door to evidence of Mendoza-Vargas's knowledge and intent regarding the contraband. Mendoza-Vargas responds that CS 09-019 was a known and anticipated witness because he "was present at trial and ready to testify even before Montes-Verduzco took the stand." Appellant's Br. p. 12 (citing Tr. p. 208-09).

---

[1] Mendoza-Vargas cites no authority that Evidence Rule 404(b) requires witnesses to be listed by name in the 404(b) notice.

10

Assuming without deciding that CS 09-019 was a known and anticipated witness for the State, we do not find that Mendoza-Vargas was prejudiced by the State's failure to disclose CS 09-019 earlier.[2] In cases where there has been a failure to comply with discovery procedures, the trial court is usually in the best position to determine the dictates of fundamental fairness and whether any resulting harm can be eliminated or satisfactorily alleviated. *Lindsey v. State*, 877 N.E.2d 190, 195 (Ind. Ct. App. 2007), *trans. denied.* The trial court must be given wide discretionary latitude in discovery matters since it has the duty to promote the discovery of truth and to guide and control the proceedings, and it will be granted deference in assessing what constitutes substantial compliance with discovery orders. *Id.* Absent clear error and resulting prejudice, the trial court's determination as to violations and sanctions should not be overturned. *Id.* Generally, the appropriate remedy for a discovery violation is a continuance. *Warren v. State*, 725 N.E.2d 828, 832 (Ind. 2000). Exclusion of evidence as a remedy for a discovery violation is proper only where there is a showing that the State's actions were deliberate or otherwise reprehensible, and this conduct prevented the defendant from receiving a fair trial. *Id.*

Here, Mendoza-Vargas requested a mistrial or a continuance. The trial court did not order a mistrial; instead, it briefly delayed the trial so that Mendoza-Vargas could interview CS 09-019 and the undercover officer. Defense counsel then reported back to the court that the witnesses cooperated during the interview. Tr. p. 234. Because there is nothing in the record to suggest that a longer continuance would have further aided

---

[2] To the extent that Mendoza-Vargas challenges the fact that both the undercover officer and the confidential source were allowed to testify as anonymous witnesses at trial, we find no error on this issue because the State had a strong interest in protecting their identities since they were both still operating in those capacities at the time of trial.

Mendoza-Vargas, we find no error in the trial court ordering a brief continuance in the trial so that Mendoza-Vargas could interview the witnesses.

Next, Mendoza-Vargas argues that even if we find that he received reasonable notice, the trial court abused its discretion in admitting evidence of his prior bad acts from the undercover officer and CS 09-019. Wide discretion is afforded the trial court in ruling on the admissibility of evidence. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012). We review evidentiary decisions for abuse of discretion and reverse only when the decision is clearly against the logic and effect of the facts and circumstances. *Id.* A claim of error in the admission of evidence will not prevail on appeal unless the error affects the substantial rights of the moving party. *Id.*

Rule 404(b) provides that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the evidence may be admissible for another purpose, such as proving intent and knowledge. Ind. Evidence Rule 404(b). In assessing the admissibility of Rule 404(b) evidence, the trial court must (1) determine whether the evidence of the crime, wrong, or other act is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Baker v. State*, 997 N.E.2d 67, 70 (Ind. Ct. App. 2013). The well-established rationale behind Rule 404(b) is that the jury is precluded from making the forbidden inference that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Id.* However, otherwise inadmissible evidence may become admissible where the defendant

12

"opens the door" to questioning on that evidence. *Clark v. State*, 915 N.E.2d 126, 130 (Ind. 2009), *reh'g denied*; *Jackson v. State*, 728 N.E.2d 147, 152 (Ind. 2000). The door may be opened when the trier of fact has been left with a false or misleading impression of the facts. *Id.*

Here, Mendoza-Vargas's roommate Montes-Verduzco testified that the drugs, gun, and money found during the search of the house on Pottawattomi Drive belonged to him and that he was the drug dealer, despite his contrary statements to the police. By presenting this evidence, Mendoza-Vargas left the jury with a false impression of the facts and therefore opened the door to the otherwise inadmissible evidence of the prior drug transactions involving Mendoza-Vargas. The State was therefore entitled to present the testimony of the undercover officer and CS 09-019 to correct this false impression. These witnesses testified that on four occasions shortly before the search of the house, Mendoza-Vargas supplied CS 09-019 with methamphetamine and then CS 09-019 sold the methamphetamine, kept some money for himself, and gave the rest of the money to Mendoza-Vargas. In addition, the undercover officer testified that some of the money from these sales was found during the search of the house. This testimony corrected the false impression that Mendoza-Vargas was not involved. Because Mendoza-Vargas opened the door to the otherwise inadmissible evidence, the trial court did not abuse its discretion in admitting the testimony of the undercover officer and CS 09-019.

Affirmed.

NAJAM, J., and BROWN, J., concur.

13